## STAFFORD and others *vs.* WEBB.

Plaintiffs and S. C. & Co. executed an agreement by which the former were to make advances to the latter on consignments of flour to be sold on commission. S. C. & Co., in pursuance of the agreement, shipped 1000 barrels of flour at Akron, Ohio, to a forwarding house in Cleveland, consigned and to be forwarded to plaintiffs in New York. Plaintiffs had at the time advanced more than the value of the flour. *Held*, that, the moment the flour was received by the forwarders at Cleveland, the title to it vested in the plaintiffs ; that the consignors had no right to change its destination; and that the plaintiffs could claim it wherever found, even from an innocent party.

Even the right of stoppage in transitu, common to consignors, did not remain with them in this case, as they had already received, by way of advance, the full amount of the proceeds of the article. *Per* NELSON, Ch. J., citing *Hodgson* v. *Loy*, 7 T. R., 440.

*Semble*, that, under the circumstances of the case, the property in the flour changed and passed to plaintiffs, when it was shipped at Akron. And the fact, that the flour continued in the actual possession of the consignors till it reached Cleveland (it having been carried from Akron to Cleveland in boats belonging to consignors), does not conflict with such a conclusion.

REPLEVIN in the detinet. An agreement was entered into between the plaintiffs and the firm of Standart, Chamberlin & Co., on the 20th January, 1841, by which the former agreed to furnish the latter funds to purchase wheat in the

state of Ohio, to be manufactured into flour and forwarded to their house in the city of New York, to be sold on commission. The advances at the then price of flour to be at the rate of $3 per barrel for Etna flour, and $2.75 for Rittenhouse, allowing five bushels of wheat to the barrel; and if prices should advance or recede, the advances to be regulated accordingly. During the winter and until the opening of navigation, the advances were to be made upon warehouse receipts, deposited at the Bank of Massillon, at the above rates; and after that, the firm of Standart, Chamberlin & Co. were to draw on the plaintiffs upon forwarding the shipping bills, and on receipt of them the drafts were to be accepted and paid. The said firm of Standart, Chamberlin & Co. agreed that all the wheat so purchased should be faithfully and promptly manufactured into flour and the flour forwarded without delay; and that during the continuance of the arrangement they would not put Etna flour into any other hands in the city of New York. The arrangement was to continue through the season of 1841.

The firm of Standart, Chamberlin & Co. manufactured and shipped to the plaintiffs, in pursuance of the aforesaid arrangement, between 17 and 18,000 barrels, the wheat having been purchased with funds furnished by the latter. The shipments were made at Akron, Ohio, on board canal boats belonging to Standart, Chamberlin & Co. to Cleveland, accompanied with bills of lading, and consigned to the plaintiffs. Duplicates were made out, one of which was kept by the shippers after being receipted by the captain of the boat, the other delivered to him; and each recited, that the cargo was to be delivered in good order to the consignees with despatch.

There was a firm of Standart, Griffith & Co. forwarding merchants at Cleveland, which embraced two of the members of the house of Standart, Chamberlin & Co., and which house were part owners of and agents for a transportation company, called the Troy and Erie line, which line had a contract with Standart, Chamberlin & Co. to transport all the flour shipped by their house that season from Cleveland to the city of New York.

On the arrival of the flour in the canal boats at Cleveland, Standart, Griffith & Co. wrote on the face of each bill of lading brought by the captain a receipt acknowledging the delivery of the flour, which was then returned to the house of Standart, Chamberlin & Co. Each barrel of flour shipped at Akron for the plaintiffs had the initials of the firm "S. G. & Co., N. Y.," marked upon it in red ink.

The plaintiffs had accepted and paid drafts drawn by the house of Standart, Chamberlin & Co. during the season of 1841, to the amount of some $90,000; and from the first of November till the middle of December there was no time when the balance in their favor did not exceed $10,000; and a balance still remains in their favor after applying the proceeds of the flour in question of upwards of $1,600.

It further appeared, that about the first of November, Standart, one of the firm of Standart, Chamberlin & Co., applied to the defendant in the city of New York and made an arrangement by which he agreed to consign to him for sale on commission 1000 barrels of flour, he agreeing to advance acceptances to the amount of $5,000. On account of the lateness of the season and uncertainty of the arrival of the flour, Standart stipulated not to use the paper until the actual delivery of the flour. The arrangement was made by Standart in the name of his firm.

On the 3d and 11th of November the 1000 barrels were shipped at Cleveland and consigned to the defendant and bills of lading transmitted to him. This was parcel of the flour shipped at Akron by the house of Standart, Chamberlin & Co., marked and consigned to the plaintiffs in the way and manner already detailed.

On the arrival of the flour in the city it was received and put in store by the defendant. A part of said acceptances, amounting to $2,500, were negotiated, presented and paid soon after the arrival of the flour.

Wheeler, one of the firm of Standart, Chamberlin & Co., on being advised by the plaintiffs that the defendant held and claimed some of the flour that had been shipped to them, came to the city to look after it, and identified the parcel of 1000 barrels in the possession of the defendant, which his

house at Akron had shipped to the plaintiffs. They were all marked with the initials of the firm, " S. G. & Co., N. Y.," had been put on board the canal boats, accompanied with bills of lading, expressing that the flour was shipped to the plaintiffs at the city of New York, and sent to the house of Standart, Griffith & Co. at Cleveland, to be re-shipped and forwarded in pursuance of the general arrangement under the contract of the 20th January before refered to.

There was proof that these initials in red ink were not such marks as would induce a consignee or purchaser to make inquiry as to the ownership of the flour, which came consigned to a respectable house.

The plaintiffs demanded the flour from the defendant, and, on refusal, brought this action. The judge charged that, under the contract proved between Standart, Chamberlin & Co. and the plaintiffs, if the flour was put up at Akron and designed to be consigned to the latter, set apart for them, and marked with their initials, and shipped to the house at Cleveland, and received by that house to be forwarded, that from the time it was so received, it became the property of the consignees, so far as to entitle them to the possession to cover their advances; and that they had a right to claim it wherever found; that the shippers, Standart, Chamberlin & Co., had no right to alter its destination; to which charge the counsel for the defendant excepted.

*By the Court*, NELSON, Ch. J.  I do not see how this case can be distinguished from several cases recently decided in this court, involving the same general doctrine applicable here, especially the cases *Holbrook* v. *Wright* (24 Wend., 169) and *Grosvenor* v. *Phillips* (2 Hill, 147), and which were founded upon *Haile* v. *Smith* (1 B. & P., 563), *Verue* v. *Jewell* (4 Camp., 31) and *Anderson* v. *Clark* (2 Bing., 20).

Both parties claiming the property in question are equally innocent, and one or the other must bear the loss; but in a court of law we can only inquire which has a prior and better title, and dispose of the case accordingly.

It is not necessary to say that the property in the flour changed and passed to the plaintiffs when shipped on board

Stafford v. Webb.

the canal boats at Akron, under the agreement of 20th January, though I think there are very strong considerations in favor of that conclusion. They had already advanced at the rate of three dollars, or two dollars and seventy-five cents, depending upon the particular brand per barrel, upon all the flour shipped, in consideration of which the consignors had agreed to forward it as soon as manufactured, with all due dispatch to their house in New York. Indeed, it appears that the full value of the flour had in point of fact already been advanced before it was shipped. It would seem reasonable, therefore, that from the moment it was set apart for the particular purpose of fulfilling the agreement, by marking upon each barrel the initials of plaintiffs' firm, putting it on board accompanied with a bill of lading, consigning it to their house, their interest in the property should be deemed to attach. This conclusion seems to accord both with the obvious intent of the parties as derived from the agreement and justice of the case.

The only argument against it is derived from the fact that the canal boats belonged exclusively to the house of Standart, Chamberlin & Co., and were under the control and direction of their servants and agents, and hence the flour still in their actual possession and custody while in the course of shipment till it reached the carriers at Cleveland. But looking at the nature of the contract, and intent of the parties, I see nothing in this arrangement or mode of transportation, necessarily interfering with or forbidding the effect I have supposed fairly deducible from the acts of the house at Akron in separating the particular parcel from the general mass, in the way already stated, and starting it to the place of destination. A destination of the goods by the vendor to the use of the vendee; marking them, or making them up to be delivered; removing them for the purpose of being delivered, may all entitle the vendee to act as owner, to assign and to maintain an action against a third person into whose hands soever they may have come. 1 Hen. Bl., 362, per Ld. Loughborough.

But be this as it may, there can be no doubt, I think, upon the cases above refered to, that the moment the flour reached

Cleveland, and was received by the forwarders for the purpose of being sent on to the consignees, both the property and possession passed and were afterwards beyond the control of the consignors. They had no more right or power to change its destination, or to appropriate it to any other use than the one to which it had been devoted, than an entire stranger. Even the right of stoppage in transitu, common to the consignor, did not remain to the shipper in this case, as he had already received by way of advance the full amount of the proceeds of the article. (*Hodgson* v. *Loy*, 7 T. R., 440.)

It was strongly urged on the argument in behalf of the defendant, that the flour in question could not be regarded as having been shipped under and in pursuance of the agreement of the 20th January, but that it was shipped to the plaintiffs as general factors or commission merchants who as such would acquire no interest or lien upon the property for previous advances, until the goods came into their actual possession. (2 Hill, 150, and cases there cited.)

The answer is, that all the testimony in the case leads to a contrary conclusion. It is true, the plaintiffs so far departed from the contract as to furnish funds at an earlier period, and exceeding the amount stipulated for; in other words, they fulfilled the agreement on their part, and something more, as they were not bound to make the advances until the receipt of the shipping bills. So far there may be said to be a modification of the contract which the course of dealing shows was assented to by all the parties concerned, and which it is not to be denied they were abundantly competent to make.

Neither do I perceive how this modification could at all affect injuriously the rights of third persons; the receipt of the shipping bills before the advances, would not have advised the defendant of the interest of the plaintiffs in the cargo consigned, nor have prevented the fraudulent change of its destination by Standart through his forwarding house at Cleveland. The defendant would have been equally subject to the imposition under either aspect of the agreement.

New trial denied.